IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020

## STATE OF TENNESSEE v. ANTHONY TREMAYNE CARTWRIGHT

**Appeal from the Criminal Court for Davidson County**
**No. 2016-D-2156     Steve R. Dozier, Judge**

_____

### No. M2019-00519-CCA-R3-CD

_____

A Davidson County Criminal Court Jury convicted the Appellant, Anthony Tremayne, Cartwright, of aggravated assault, a Class C felony, and domestic assault, a Class A misdemeanor, and the trial court sentenced him to consecutive sentences of fourteen years and eleven months, twenty-nine days, respectively.  On appeal, the Appellant contends that the evidence is insufficient to support his convictions because the victim's testimony was unreliable and actually shows he was acting in self-defense.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Jay Allen Umerley (on appeal) and Andrew Chad Davidson (at trial), Nashville, Tennessee, for the appellant, Anthony Tremayne Cartwright.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Kate Melby and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In November 2016, the Davidson County Grand Jury indicted the Appellant for two counts of aggravated assault against the victim, Nekedah Owens.  At trial, the victim testified that in April 2016, the Appellant was her boyfriend.  On the night of April 15, the victim consumed "about a whole pint of vodka," "went through" the Appellant's cellular telephone, and discovered he had been "texting other girls."    The victim went

into her bedroom and locked the door, but the Appellant "kicked it down" to get his telephone from her. The victim said that she hit the Appellant and that she "must have hit him too hard" because they began "tussling." The Appellant went to the front door and tried to leave, but the victim hit him again. The victim ended up on the floor with the Appellant on top of her.

The victim testified that the Appellant started choking her with both of his hands. The State asked the victim, "And on a scale of 1 to 10, how hard was he squeezing your neck?" The victim answered, "About an eight and [a] half." The victim could not breathe and was crying, and she tried to "swing" at the Appellant to stop him. The Appellant strangled the victim for thirty to fifty seconds, and the victim's eyes were "rolling behind [her] head." The Appellant stopped choking the victim and left her home.

The victim testified that her neighbors heard her screaming and called the police. The victim's neck was sore. She also had scratches on her neck but would not allow the police to photograph her injuries because she was trying to protect the Appellant. The victim said that she was "drunk" at the time of the incident but that she remembered what happened.

The victim testified that on June 19, 2016, she and the Appellant were supposed to meet at a hotel room. The victim explained to the jury that she agreed to meet him because he had been "messing around" with another woman and because the victim was "going to kick his ass at the room." The victim consumed Xanax and alcohol and "ended up passing out" at her home, which did not have air conditioning at the time. The Appellant arrived at the victim's residence, woke her, and told her that it was too hot in the house. The victim said that the Appellant made her go outside and that he was trying to save her life.

The victim testified that she started crying and "going off on" the Appellant. The victim and the Appellant got into a car, but the Appellant "jumped out of the car and took off running." The Appellant ended up on 17th Avenue North. The victim stated that she also ended up on 17th Avenue North and that she was "blacking in and out." She stated, "I didn't even know how I got down there. I was down there without no shoes on. That's how I know I was tripping and I was under the influence and all of that." The victim said that she "cussed out some dude," that she tried to break out the Appellant's car window with a brick, and that she and the Appellant argued. The victim saw a "flash of white light" and "woke up on the ground." The State asked who hit her, and the victim answered, "I'm not going to say that he did or didn't do it, but [he] was the person that I was arguing with." The victim said that she also remembered being dragged but that she did not know who dragged her. The victim stated that she was lying on her back and that

one of her ears was bleeding.  The victim looked to her right and saw the Appellant's car "pull off."  She said the Appellant left her lying in the middle of the street.

The victim testified that she was "in and out of consciousness" during the incident.  She said that she did not see the Appellant hit her but that he was "right in front of [her]" before she ended up on the ground and that she thought he hit her.  The police arrived at the scene, and the victim was transported to a hospital.  She said that one of her ears was "ripped apart" and that her eardrum was ruptured.  The victim received twenty-four stitches and suffered nerve damage to her ear.  At the time of the Appellant's trial, she was still experiencing ear pain.  The victim said that her damaged ear was "smaller" than her other ear and that she tried to keep her hair pulled down over it.  She said that although she consumed alcohol and Xanax that night, she remembered what happened.

The victim acknowledged testifying at the Appellant's preliminary hearing.  During the hearing, the victim frequently said she did not remember what happened on April 15 and June 19.  She said she lied at the hearing because she was trying to protect the Appellant.  The victim said she was five feet, three inches tall and weighed about one hundred fifteen pounds.

On cross-examination, the victim testified that she was a single parent with five children and that she first met the Appellant in September 2012.  She said she had been diagnosed with bipolar disorder, borderline personality disorder, depression, schizoaffective disorder, and "[p]robably posttraumatic stress."  The victim was not taking any medications for her mental illnesses in April or June 2016.  The victim took Xanax on June 19, but she did not have a prescription for the drug.  The victim acknowledged that she "blacked out" during both incidents and said that no one ever told her not to consume Xanax with alcohol.

The victim testified that she had "anger issues" but that she had never been diagnosed with an anger problem.  She stated, "I feel like all of this could have been avoided if he would have been honest with me about a lot of stuff. . . . And he knows how I react."  She said that she loved the Appellant, that she was not afraid of him, and that "[h]e's probably afraid of me."

Officer Phillip Black of the Metropolitan Nashville Police Department (MNPD) testified that at 12:21 a.m. on April 15, 2016, he responded to an address on 22nd Avenue North.  He arrived at the scene three minutes later and found it "pretty chaotic."  Medical personnel and other officers were present, and the victim was "kind of distraught."  She had scratches on her neck, upper left cheek, right elbow, and right knee and named the Appellant, who was not present, as her assailant.  The victim was transported to a hospital.  Officer Black went into the victim's home and saw that a door "was knocked

- 3 -

off of the hinges in the back bedroom." He acknowledged that the door was "completely off" its hinges and said that the door was "laying on the floor."

Officer Black testified that on June 19, 2016, he was dispatched to 17th Avenue North and Cockrill Street, which was a couple of streets east of the previous address. When he arrived, the victim had a "severe" injury to her ear and was bleeding "profusely." The victim's ear had been "ripped partially off." The victim was "[e]xtremely distraught and upset" and was transported to a hospital.

On cross-examination, Officer Black testified that the victim refused to let him photograph her neck on April 15. He said that he did not see any swelling to her neck but that "sometimes it takes some days or hours to show up." The victim told Officer Black that she did not lose consciousness during the incident. Officer Black said that when he arrived on the scene on June 19, the victim was "angry upset belligerent, in a lot of pain." He said she did not appear to be intoxicated on April 15 or June 19.

Jason Holley, the victim's uncle, testified that on April 15, 2016, he learned the victim had gone to a hospital. Holley went there and saw that the victim had scratches on her neck. In the early morning hours of June 19, Holley learned the victim was in the hospital again. He said that he went there and that "like a piece of her ear was off."

Holley testified that after the first incident but prior to May 1, 2016, the Appellant telephoned him. Holley asked the Appellant why he had assaulted the victim, and the Appellant told Holley to "stay out" of their relationship. Holley said, "[He] stated if I didn't, he would F-me up."

On cross-examination, Holley acknowledged that he loved the victim. He said his conversation with the Appellant lasted one minute or less.

Officer Trevin Tolbert of the MNPD testified that on April 15, 2016, he responded to a home on 22nd Avenue North. Officer Black was present when Officer Tolbert arrived. Officer Tolbert said that he went into the victim's house and that the interior was "pretty disheveled and one of the rear bedroom doors had been forced open and kicked down." The victim was present, but Officer Black did not speak with her.

Officer Tolbert testified that on June 19, 2016, he received a call "about a young lady that was laying in the street or on the sidewalk bleeding." Officer Tolbert went to 17th Avenue North and found the victim lying on the sidewalk. She was bleeding and appeared to have a severe laceration around her ear. Officer Tolbert put on gloves and applied pressure to the wound until medics arrived. He said that the victim was in pain, that she was "pretty upset," and that she "wasn't really able to say much." The victim

- 4 -

was transported by ambulance to a hospital, and Officer Tolbert followed her. He said that when they arrived at the hospital, he could see that "the top of her ear looked like it was basically ripped in half." The Appellant was the only suspect in this case and was described as an African-American male; five feet, eleven inches to six feet tall; and weighing about two hundred thirty pounds.

On cross-examination, Officer Tolbert testified that the victim "didn't appear to be intoxicated at all" during the June incident but that she was "very upset." He explained that the victim "would be excited and then not excited" and acknowledged that she was not "as responsive" at times. The victim "basically said" the Appellant attacked her. At the conclusion of Officer Tolbert's testimony, the State rested its case.

The Appellant testified that he began dating the victim in 2012. On April 15, 2016, he went to her house, and they had sex. The Appellant left the victim's home but had to return to get his telephone. He said that the victim had "went through" his telephone, that she had "seen some texts," and that she started hitting him. The Appellant tried to leave, but the victim pulled his hair. The Appellant asked the victim for his telephone, but she hit him with it. The Appellant said that he was trying to keep the victim from hitting him and that he was holding her hands so she could not hit him in the face. He stated, "I . . . probably held her for a few seconds to see if she will calm down. Sometimes she will calm down, sometimes she won't." The Appellant got off the victim and "took off running." He said that he did not kick down the victim's bedroom door and that the door "was already tore up from a fight she had with her cousin." The Appellant stated that the door was already off its hinges and that he "moved the door to the side" so he could get into the bedroom and get his telephone from her. The Appellant said that he was "seeing other [women]" and that he "got caught." He said that he never hit or strangled the victim and that he thought the victim was intoxicated.

The Appellant testified that on June 19, 2016, the victim was "kind of mad" at him because he had posted information on Facebook about a trip he took with his children and another woman. The victim worked at KFC, so the Appellant went there and apologized to her. The victim agreed to meet him at a hotel room. That night, the Appellant stopped by the victim's home. He found her front door "wide open" and the victim asleep. She was "drenched" in sweat, so he made her go outside to get some air. The victim tried to hit the Appellant, and he "jumped in the backseat" of his friend's car. The victim got into the front seat of the car, climbed into the back seat, and was hitting and kicking the Appellant. The Appellant "jumped out of the car and took off running."

The Appellant testified that he went to his aunt's house on 17th Avenue North and that the victim showed up five to ten minutes later. He said that she was "arguing with everybody" and that she "almost got into a fistfight with this other man." The Appellant

stopped the man from hurting the victim, and the victim started chasing the Appellant. The victim could not catch the Appellant, so she tried to break the windows of his car with a brick. The victim grabbed a beer bottle off the ground and tried to hit the Appellant, but he wrestled it away from her. He stated as follows:

> And then some kind of way man, I don't know, I think I took my eyes off of her -- I think I took my eyes off of her for a split second. And then when I turned around, she was there with a brick trying to hit me with it. And all I did was just push her to keep her from hitting me with the brick and, you know what I'm saying, and she fell. That's all it was.

The Appellant acknowledged he was acting in self-defense. He said he thought the victim was intoxicated on June 19 because her cousin told him that the victim "took a pill" and "had been drinking."

On cross-examination, the Appellant testified that he tried to leave the victim's house on April 15 but that she was holding him down. He said that the victim "got tired and gave up" and that he "took off running." He acknowledged that he did not call the police on the victim and denied calling or threatening Jason Holley.

The Appellant acknowledged that the victim's ear may have been "damaged" on June 19 when he pushed her. He said that she fell and was "out" and that he did not see her bleeding. The Appellant got into his car and left the scene. He acknowledged having prior convictions for felony theft, aggravated burglary, and attempted tampering with evidence. He said he was five feet, nine inches tall and weighed one hundred eighty pounds.

At the conclusion of the Appellant's testimony, the jury found him guilty of domestic assault as a lesser-included offense of aggravated assault for the April 15 incident and guilty as charged in the indictment of aggravated assault for the June 19 incident. After a sentencing hearing, the trial court sentenced him as a Range III, persistent offender to fourteen years for aggravated assault, a Class C felony, and eleven months twenty-nine days for domestic assault, a Class A misdemeanor. The trial court ordered that the Appellant serve the eleven-month, twenty-nine-day sentence consecutively to the fourteen-year sentence and ordered that he serve both sentences consecutively to a previous sentence.

## II. Analysis

The Appellant claims that the evidence is insufficient to support the convictions because the jury gave "undue" weight to the victim's testimony. He asserts that the

victim's alcohol and drug use show that she did not have an accurate recollection of what happened on April 15 or June 19 and that her testimony shows he was acting in self-defense. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

In count one of the indictment, the Appellant was charged with aggravated assault by strangulation for the April 15 incident; however, the jury convicted him of the lesser-included offense of domestic assault. Domestic assault is defined as intentionally, knowingly, or recklessly causing bodily injury to a domestic abuse victim. Tenn. Code Ann. § 39-13-111(b). "Bodily injury" is defined as "including a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). A "domestic abuse victim" includes adults who are dating, who have dated, or who have had a sexual relationship. Tenn. Code Ann. § 39-13-111(a)(2), (3).

In count two of the indictment, the Appellant was charged with and convicted of aggravated assault for the June 19 incident. Relevant to this case, a person commits aggravated assault who intentionally or knowingly commits an assault and the assault results in serious bodily injury. Tenn. Code Ann. § 39-13-102(a)(1)(A)(i). A person commits assault who intentionally or knowingly causes another reasonably to fear imminent bodily injury. See Tenn. Code Ann. § 39-13-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that the victim and the Appellant were dating and had a sexual relationship. On April 15, 2016, the victim consumed a pint of vodka, looked through the Appellant's telephone, and became upset. When the Appellant returned to the victim's home to get his telephone, the victim went into her bedroom and locked the door. The Appellant kicked open the door, and the victim hit him with the telephone. They tussled, and the Appellant ended up on top of the victim with his hands around her neck. After the incident, the victim's neck was sore, and Officer Phillips saw scratches on her neck and other parts of her body. On June 19, 2016, the victim consumed alcohol and Xanax. She and the Appellant had an altercation outside her home and ended up on 17th Avenue North. They argued, and the Appellant hit the victim, knocking her to the ground. During the melee, the victim's ear was partially ripped off. Although the Appellant claims that the victim was not credible because she had consumed alcohol and drugs, the credibility of the witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). The victim testified that she remembered both incidents, and Officer Black testified that the victim did not appear to be intoxicated on April 15 or June 19. Therefore, we conclude that the evidence is sufficient to support the Appellant's convictions of aggravated assault and domestic assault.

As to the Appellant's claim that he was acting in self-defense, Tennessee Code Annotated section 39-11-611(b)(1) provides that

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

In this case, the trial court instructed the jury on self-defense, and the jury rejected that defense. Given that the Appellant kicked down the victim's bedroom door and tussled with her on April 15, causing scratches to her body, and that he knocked her to the ground, tearing her ear, on June 19, we agree that a reasonable jury could have rejected the Appellant's self-defense claim. We note that the victim was only five feet, three inches tall and weighed one hundred fifteen pounds whereas the Appellant was five feet nine inches tall and weighed at least one hundred eighty pounds. Accordingly, the evidence is sufficient to support the Appellant's convictions.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE